# Court of General Sessions of the Peace and Jail Delivery.

————•————

STATE *v.* JOHN FITZPATRICK and MICHAEL McGURGAN.

*Larceny—Pleading—Indictment—Proof—Bill of Exchange.*

Larceny is the wrongful or fraudulent taking and carrying away of the personal goods of another with a felonious intent to convert them to the taker's own use without the consent of the owner.

In an indictment for larceny the ownership of the property must be averred and, being a material and traversable fact, must be proved as alleged: But where said ownership is in an incorporated railroad company of this State it need not be averred that said company was a corporation of this State, nor proof made by the production of its charter or a legal copy thereof that it was such at the time the offence was alleged to have been committed.

A bill of exchange becomes the property of the payee as soon as endorsed by him; and if at once handed back to the drawer for purposes beneficial to the payee, the general property therein, or the cash obtained thereon, remains in the payee and the drawer becomes a bailee thereof.

Taking one's own property from the possession of a bailee, who has an interest therein, with fraudulent and felonious intent of charging the bailee with having applied or converted it to his own use, is larceny. Publicity of the wrongful taking repels the idea of a felonious intent.

(*New Castle, February, 1885.*)

25

INDICTMENT FOR LARCENY.

*George Gray*, Attorney General, and *H. H. Ward*, Deputy Attorney General, for the State.

*John Biggs* and *Mr. Sharpley*, for the prisoners.

COMEGYS, C. J., charging the jury:

*Gentlemen of the Jury:* After an experience of now about fifty years with law, as student, practitioner and Judge, I can safely say to you that the circumstances of this case are such as I have never met with before. The learned Attorney General and his associate contend that they come within the scope and range of larcenies under our statute, which the learned counsel for the prisoners contend quite the contrary—bringing forward, in support of their contention, many authorities, the law of most of which is not disputed by the State, though their application to the facts elicited by the proof is denied. It thus devolves upon us, in the course of our duty to you to state what larceny in law is; and I need hardly say to a jury so well qualified to try a case, as I believe you to be, that what is given in charge to you by the Court in this respect, is to be accepted by you as the law for your guidance without any question how opposite it may appear to you to be to any views you have on it.

Before, however, I proceed with this duty, I think it proper to observe that in deciding upon the facts laid before you by the proof oral and written, you must not allow anything to enter into your estimate of the case but the facts which have testified to, and the papers which have proved and admitted in evidence. Further, it is due to the prisoners who are charged in the indictment with this serious crime, that I should say—as is in fact usually said in all cases of crime, or of misdemeanor only, that the presumption of law is in favor of innocence; that is, that every one, charged with a crime, is presumed to be innocent, and that no conviction can be rightfully made unless the jury are satisfied, from the proof in the case and from that only, that a party charged is guilty beyond a

reasonable doubt—which is only another way of saying, that unless the minds of the entire panel of jurors are convinced beyond such a doubt as reasonable men should, from the proof, before them after calmly considering it, entertain of the guilt imputed, the verdict should be one of acquital.  No suspicions or conjectures are to be indulged in, but only facts and circumstances proved are to be allowed any weight.  No consequence in criminal trials is to be given to mere weight of testimony.  Unless the facts, relied upon for conviction, are so evident, and compulsory of the mind, as to exclude any doubt of guilt, they must not be allowed to make up a verdict of guilty.  A prisoner must not be convicted, if any doubt of guilt of a reasonable nature growing out of the facts proved, or by reason of their insufficiency, exist in the jurors' minds.  I proceed now to the task of telling you what larceny is.

Larceny is "the wrongful or fraudulent taking and carrying away, by any person of the mere personal goods of another from any place with a *felonous intent* to convert them to his (the taker's) own use and make them his own property, without the consent of the owner."  This definition is said, by many learned law writers to be "the most approved definition of this offence at common law."  I may say to you that our statute, which is based upon that law, takes the same view of the offence, using, however, the words which mean the same thing as unlawful or fraudulent taking and carrying away, in the definition—unlawfully or fraudulently meaning stealing.  The meaning is this then, that if one steal, take and carry away from the owner his goods and chattels, he is guilty of the crime of larceny.  To steal a man's property, therefore, is to take it from his custody, with a felonious intent, which felonious intent is the purpose of appropriating it, fradulently, to the taker's own use.  The felonious intent must exist, or there is no larceny.

You will observe that the property taken must be another man's ; for the crime cannot be committed by one who takes his own goods—unless they have been by him committed to the custody of another, and they are taken away from such custody for the

puspose of, in some way, holder the possession, who is called the bailee responsible or liable for them to the depositor, who is called the bailor. It is quite evident, therefore, that if the taking be done in a public manner, so that it can be proved that the depositor took them, no such liability can be claimed to exist—the publicity of the act precluding all inference that the bailee himself used, or appropriated them, for his own benefit.

It being necessary that the goods alleged to have been stolen are not the taker's property, but that of another person, it must be set forth in the indictment, or charge, that they are the property of another, the name of that other must be set forth therein. This necessity grows out of the requirement that all indictments shall show the party charged in them exactly what he has to meet at his trial. In the indictment you are trying, the money alleged to have been taken, is charged as being the money, goods and chattles of the Baltimore and Philadelphia Railroad Company, and here let me say that the objection made to this indictment, that it should have been averred that this company was a corporation of this State, and proof should have been made by the production of its charter or a legal copy of it that it was such at the time the offence is alleged to have been committed, is not a valid one, the same point having been several times raised in this Court, and as often ruled against. You will perceive, therefore, that it was incumbent on the State to prove to your satisfaction that the money was the company's property, when I inform you, as I now do, that the allegation of such ownership was a material and disputable, or as we say, traversable fact, which, according to the rule of pleading, must be alleged and proved. We come then to one of the vital questions in this case—was the money taken the property of the railroad? If it were not, the prisoners cannot be committed, and if it were they are not liable, under this indictment if the taking was of such a nature as precludes the idea of a felonious or fraudulent taking, that is, of theft. Now this question of property in the railroad company depends upon the evidence in the case, which is all before

you. You are to judge of the credibility of such part of it as proceeded from the mouths of the witnesses. There is some difference of statement in regard to some of the facts; but about others there is none that we have discovered. When you find the testimony to be conflicting you must endeavor to reconcile it if you can; if you cannot, then you should give credit where you think the credit clearly belongs.

The undisputed facts seem to be, briefly and substantially these.—The railroad was engaged at the time of the occurrences, in building a railroad through this State from Baltimore to Philadelphia, and the prisoners were contractors to do the work on section 22 of the route. They were bound by an express contract, in proof before you, for the performance of their work, the company being bound also by it to pay them therefor, which payment was to be made monthly, as the work progressed, upon estimates of it made by the company's engineer in chief, and certificates made out accordingly. There are stipulations in this contract that the company shall have the right to retain fifteen per centum of the amount of the estimates to insure itself against any defective execution of the agreement of the contractors. This has been shown to you to be the stipulation in all the company's contracts; and the prisoners, the contractors for the work of section 22, by the paper signed by them, in evidence before you, bound themselves by all such stipulations as were applicable to their work. The effect of this was, to make the form of contract referred to, a part of their agreement. There is also another stipulation in such form of contract, which is that the chief engineer of the company shall have the right to apply such part of his estimates as shall be necessary to pay the men employed by the contractors to labor for them, and for supplies furnished to them. This we say to you is what the contract between the parties means, although it is contended by the prisoners' counsel that it means the company's engineer shall pay this out of the fifteen per cent deduction, or that it shall be taken into account as a fund for such payment along with that to which the company contends, and

we support it in that contention, the stipulation alone applies. We have now what the last estimates were made by the engineer. When the division engineer, the witness B. F. Richardson was made aware of this, he notified the engineer in chief to send the money directly to him, he it seems deeming it prudent to then avail the company of the benefit of the stipulation. I have mentioned about retention of such part of it as might be necessary to pay the laborers &c. The chief engineer answered him that he had already made out and forwarded to him a draft for the amount but suggesting that he could get it endorsed to himself. In pursuance of this suggestion, Richardson had a conference with the contractors on the subject who first objected to the plan proposed for a reason given, but finally consented and made their indorsement on the draft and delivered it to Richardson, who returned and he in his turn indorsed and delivered it to the witness William B. Carswell in order that he might draw the money upon it, which he did by negotiating it with the Farmers Bank in this city. The draft was upon a Bank in Baltimore, and was in usual form expressed to be for value received. In due time Richardson and Carswell (who was a clerk in his office) proceeded into the country, and in a house there where the contractors were then staying, met them and entered upon the business of counting out the money and putting it in envelopes for the purpose, with the number of the laborers and others to whom it was due according to the pay rolls of the contractors and the sum stated on such to be due the persons indicated by the indorsements. (The names of the laborers being unknown their identity was shown by their respective numbers) When the work was about two thirds done by Carswell, and the witness Michael T. D. Scanlan, who was clerk to the contractors, Richardson had occasion to leave and was not present afterwards. The clerks, however, proceeded by Richardson's order with the work, each counting the sums—Carswell taking them out of the satchel or bag in which the whole amount had been brought out from the city and Scanlan putting them in the bag which belonged to the

contractors. When the count and enveloping was over, there was found to be a balance of $216.00 which Carswell handed to the prisoner McGurgan. Carswell says that McGurgan then picked up the bag containing the allotted money, and said, " I dont blame you at all, you can now pay the men," that McGurgan then started up stairs and he, the witness, followed him and asked him what he meant; that the reply he received was that he, McGurgan, was going to pay his honest debts and the company might pay the men and the work could stop; that the witness then said, "I'll see about that." He says he went back to get his valise, but saw Fitzpatrick there; that he did not go in, but stood at the door; he then heard some one coming down stairs, looked and saw a man they called Mac, the stable boss with the valise in his hand the envelopes had been put in, and that McGurgan was behind him; that there was a wagon ready and they went off driving in a gallop, and that he pursued them. This, as we know, was without effect.—The same account, substantially, of the counting, enveloping and depositing in the second valise is given by Scanlan; but he deposes to the additional fact, which it is proper I should call your attention to, that when the counting was over, Carswell asked, " what are you going to do with the money ?" I should here state that Scanlan stated that when Richardson and Carswell drove up each had a valise; it may be that it was into the second one of them that the money was put when counted and enveloped); that in answer to this question McGurgan said he'd take it; that he did so; that he then said, " Mr. Carswell we propose to take charge of this money, it is ours, and we mean to have our own; the company have not done right by us and we must protect ourselves, and now we propose to pay nothing but our honest debts;" that Carswell then said, " Don't you intend to pay the men?" to which McGurgan answered, " We propose to pay our honest debts, the company can pay the laborers out of our estimate and give the contract to Stewart as they have threatened to do." He says that McGurgan did not go up stairs while Carswell was there; but Carswell says that Scanlan

was not in a position to see whether he did or not. —I believe I have now recited substantially the proof which was made; if I have at all erred, your recollection is to be your guide, though I have recited what I find upon my notes. We are now in a situation to advise you with respect to the question whose property this money was.

You will recall to your mind the fact that the chief engineer forwarded to Richardson his draft on a Baltimore bank to pay the prisoners the money due them, for the month of September, according to his estimates. This paper, being an order on the bank where the funds of the company's work was made payable to the order of the prisoners, for value received. It represented the money due them, though it was not sent to them but to Richardson. He retained it, as I have said, and it did not come to their possesion until he saw them with respect to the application of some of the money it called for. When it did come to their possession and they put their names on the back of it, and delivered it over to Richardson, it was their property, it being the means taken to pay them for their work, according to the estimate, which they receipted for by placing their names, by their endorsement. I say it became their property. This leads me to say that there may be property (that is ownership) by two persons in the same thing at the same time, and an instance of it was then furnished. The prisoners had a general property in the draft when they endorsed it, accepting it as pay for their work. When they gave it to Richardson for the purpose intended he became a special owner of it for the object required. He was then bailee; they, bailors. When the money was obtained upon the draft by Richardson's clerk, for him, no change took place in the relations of the bailors and the bailee; they remained the same. The money was, as the draft was, the general property of the prisoners, but Richardson had a special property in it for the purpose of disposing of it if it was necessary according to their understanding and their contract. Richardson, or the company (it is immaterial which, for which he was an officer of it, and should

be considered as an agent in the transaction), was but the agent of the prisoners to dispose of the money—which was their money. Thus there were the two classes of propery in this money which are known tò the law.   You give one your money and send him with it to pay a bill which it is his interest you should pay.   It is your money, but as against every body but you he has a right of possession of it, called in such case a special ownership, which he asserts in a Court of law.   A pecuniary interest, in this money the company had not, but it had the right to hold it, according to the contract of the prisoners and the understanding at the time of the indorsement of the draft, against them until the purpose of delivering it, was accomplished.   When, therefore, Richardson and his clerk, Carswell, went out with the money to pay off the laborers, or attend to it being done, the money they carried with them, the proceeds of the draft, was still the general property of the prisoners, burdened with and hampered by the special property they had given the company to carry into effect this contract with it.   Two of the counts in the indictment allege the property in the money to be that of the company.   This is right; for it is the law that in describing the ownership of property in an indictment a special ownership will answer as well as a general one ; but of course the fact must consist with the agreement.   Carswell, we say to you, had no property whatever in this money—be being but a mere clerk of Richardson.

It being the case then that the railroad company, through its officer, Richardson, having a qualified or special ownership over this money, could the general owners, those who alone had a pecuniary interest in it, steal it from their own bailee?   Now there are different kinds of bailees, some with and some without an interest in the custody of the property.   Those having none are mere depositors, and the general owner can resume possession of his goods at any time and in any way not resorting originally to violence. But where the depository has an interest in his possession, the general owner has no right at his pleasure to resume that he parted

with.   Apply that doctrine to this case, and the prisoners had no right to take that money and go off with it.   It was theirs generally, but it was that of its bailee, the company also ; but did they steal it from the company ?   It might with some plausibility be contended that they took it into their possession by consent—Carswell by the state of Scanlon, if you credit that, having inquired what should be done with it, thereby implying that they had the right to the possession of it; but I do not view this statement, if correct, as of any account, for Carswell was not an officer of the company, as I understand it, but was in the employ simply of Richardson.   A man cannot steal his own property is a proposition indisputable ; but it is the law that he may steal it from his depositary, or bailee.   It it only, however, where it appears that the object of taking it from the custody of the bailee was to make him liable to him, the depositor, that the idea of larceny can exist.   It is not the wrongful taking from the bailee that makes it larceny ; but the taking with the fraudulent, felonious intent, of charging him with having applied or converted it to his own use.   This is what has been held to be larceny—though of a man's own property.   But you observe that the object is to charge the bailee with the value of the property.   It should therefore appear that the act of taking the property from the bailee was done secretly, so as to deprive the bailiff of any means of protecting himself by proof.   Publicity of the wrongful taking of property always repels the idea of a larcenous or felonious intent, unless it be attended by circumstances such as putting the custodian in fear, &c.   When possession is thus obtained, if the purpose appear to be a felonious one, publicity of the act is no defence.

Now, gentlemen, I have at much length, endeavored to put this case before you as the Court understands the law to be.   It is now your duty with that law before you, and all the evidence to say whether or not you think the prisoners believed *bona fide* that the money was theirs and they had a right to take it.   If you think so, you ought to acquit them of this charge.   Should you not think

it, you would still have ample ground to refuse to them this as a case of larceny on the ground of the publicity of the transaction.— The case is before you ; but you will allow me to remind you that you should not convict, unless your minds are clear that the prisoners are guilty in law of the crime of stealing, with which they are charged.

Verdict guilty with recommendation to the mercy of the Court.